CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
March 25, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
    DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| LaQuandra Erica Ross,<br><br>        *Plaintiff*,<br>  v.<br><br>Amanda Conner, *et al.*,<br><br>        *Defendants*. | Case No. 3:23-cv-00057<br><br>MEMORANDUM OPINION<br>& ORDER<br><br>Judge Norman K. Moon |

  Plaintiff LaQuandra Erica Ross initiated this 42 U.S.C. § 1983 action asserting unlawful seizure, excessive force, and malicious prosecution claims against Defendant police officers Amanda Conner and Dwayne Jones. Dkt. 2 ("Compl."). Defendants have moved for summary judgment. Dkt. 9 ("Mot. Summ. J."); Dkt. 10 ("Br. in Supp."). Because the evidence does not support Plaintiff's claims, Defendants' Motion for Summary Judgment (Dkt. 9) is granted.

  **I.**   **Legal Standard**

  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The nonmoving party must "show that there is a genuine dispute of material fact . . . by offering sufficient proof in the form of admissible evidence." *Id.* (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility

determinations." *Id.*

## II. Background

On the afternoon of October 12, 2023, Defendant Officer Amanda Conner responded to a dispatch call involving a "priority two domestic." Dkt. 10-1 ("Conner Decl.") ¶¶ 4–5; Conner Decl. Ex. 1-1 ("Dispatch" recording) 00:00–00:12. Dispatch identified Melissa Townes as the caller and provided an address for 525 Burgoyne Road, Apartment 6, Charlottesville, Virginia 22901. *Id.* According to Dispatch, Townes reported that she and her girlfriend had been arguing and that her girlfriend was removing belongings from Townes' apartment. Dispatch identified the girlfriend as 34-year-old black female, LaQuandra Ross, who was wearing a black jacket, black shirt, grey pants, and black hat. Conner Decl. ¶ 6; Dispatch 100:13–00:30. Dispatch also advised that Ross had taken Townes' firearm. Conner Decl. ¶ 7; Dispatch 00:45–01:07.

Conner arrived on scene, parked, and exited her vehicle outside of the apartment building where Ross was leaning on the hood of a Jeep. Conner Decl. Ex. 1-2 ("Conner Body Cam") 00:00–00:06. Conner approached Ross after Townes pointed her out. Compl. at 2; Conner Decl. ¶ 9; Conner Body Cam 00:17–00:29. Conner asked Ross "What's going on today?" Ross responded after pointing at Townes, "She called you, talk to her. Don't talk to me." Conner Decl. ¶ 10; Conner Body Cam 00:30–00:36; Compl. at 3. As she got closer to Ross, Conner again asked, "What's going on today?" Ross said, "Please don't talk to me." Ross then told Conner to "get out of her face." Conner Body Cam 00:37–00:43.

Conner attempted to explain why she was there, and Ross responded, "I don't care why you're here. I'm outside waiting on a ride." Conner Decl. ¶ 10; Conner Body Cam 00:44–00:48; Compl. at 3. Ross then walked away from Conner towards a pile of items on the curb. Compl. at 4; Conner Decl. ¶ 10; Conner Body Cam 00:44–00:48. Because Conner had information that

2

Ross had been involved in a domestic dispute and had taken Townes' firearm, Conner attempted to briefly detain Ross by instructing her to stand still so that she could investigate the situation. Conner Decl. ¶ 11. Ross responded, "I ain't gonna stand nowhere," and walked behind the Jeep. Conner Decl. ¶ 13; Conner Body Cam 00:49–00:57. Ross refused to speak with Conner and comply with her order to stand still, preventing Conner from conducting her investigation. Conner Decl. ¶ 12; Compl. at 3-4.

As Ross walked behind the Jeep, Conner attempted to maintain visibility of Ross' hands in case she reached for the missing firearm or another weapon. Conner Decl. ¶ 13. Conner decided to temporarily detain Ross by placing her in handcuffs to ensure the safety of those present and to permit Conner to investigate the domestic disturbance. Conner Decl. ¶ 14. Conner also requested that dispatch "hold the air," which meant to temporarily stop radio traffic in case she needed to request emergency assistance. Conner Decl. ¶ 14; Conner Body Cam 00:53–00:57. Hearing this, Jones activated his vehicle's lights and siren and increased his driving speed out of concern for officer safety. Dkt. 10-2 ("Jones Decl.") ¶ 9.

Conner ordered Ross to put her hands behind her back. Ross responded, "I ain't gonna put my hands nowhere." Ross then faced Conner, clinched her fists, and said—three times— "Touch me and I'm going to light yo ass up," as she again moved out of Conner's line of sight. Conner Decl. ¶ 15; Conner Body Cam 00:57–01:08. Given Ross' threats and aggressive behavior Conner notified Jones that she was upgrading the domestic dispute to a "priority 1," to reflect that the situation was an emergency. Conner Decl. ¶ 16; Conner Body Cam 01:09–01:14; Jones Decl. ¶ 11.

After Ross said a fourth time, "Touch me and I'm going to light yo ass up," Conner ordered Ross to stand still. Ross responded, "I ain't got to stand still. I ain't got to stand

3

still at all," and walked away from Conner. Conner Body Cam 01:08–01:15. Conner followed Ross, told her to stop, and tried to explain that she was being detained. Ross refused to listen, squared her stance, clinched her fists, and said twice again, "Touch me and I'm going to light yo ass up." Ross again walked away from Conner. Conner Body Cam 01:16–01:23. After Conner again told Ross to stop, Ross turned quickly to face Conner as if preparing to fight. She then once again walked away from Conner. Conner Body Cam 01:24–01:29.

Ross then saw her "ride" and walked over to the pile of items outside of the apartment building. Conner ordered Ross to stand in view, to which Ross responded, "I bet you see me standing in this car when this car pull up," and began to walk toward Conner. Conner Body Cam 01:30–01:40. At 3:42 p.m., Conner radioed Jones and asked, "How far away are you?" Jones responded that he was attempting to get around traffic. Conner Body Cam 01:35–01:47. Ross yelled to her "ride," "Come the fuck over here, so I can get the fuck out of here." Ross then walked over to the pile of items, picked up a bag, and began walking to her "ride." Conner Body Cam 01:40–02:03.

Conner decided to maintain a safe distance from Ross and wait for other officers to arrive before attempting to place Ross in handcuffs. Conner told Ross that she was not leaving. Ross responded, "Betchu I am." Conner again told Ross that she was not leaving. Ross walked to her "ride" and placed a bag of items in the backseat. Conner Decl. ¶¶ 17–18; Conner Body Cam 01:59–02:13. Conner instructed the driver of the vehicle—Ross' mother—that she was not to leave with Ross. After Ross placed the bag in the backseat, she walked back to the pile of items and grabbed more items to load into the vehicle. Conner Decl. ¶¶ 19; Conner Body Cam 02:12–02:46.

4

At 3:43 p.m., Jones arrived outside the apartment building. Conner advised Jones that Ross would not allow Conner to detain her. As Conner walked towards Ross, Ross stated, "Yo, you touch me, I'm going to fight you, and I'm going to tell you just like that," as Ross loaded more belongings into the vehicle's backseat. Conner Decl. ¶¶ 20–21; Conner Body Cam 02:45–02:54; Jones Decl. Ex. 2-1 ("Jones Body Cam") 02:10–02:14.

As Jones approached Ross from behind and asked, "What's up? What's going on?" Ross quickly closed the backdoor of the vehicle and spun as if preparing to run. Out of concern for officer safety, Jones attempted to grab Ross' right arm to prevent Ross from running. Jones Decl. ¶ 15. Ross pulled free of Jones' grip and started swinging her arms, hitting Jones, backing away from Defendants, and repeatedly stating, "Get the fuck up off me." Ross also raised her fists and pushed Jones away from her. Jones Body Cam 02:15–02:30; Jones Decl. ¶ 15; Conner Decl. ¶ 22. Ross continued to resist Jones' and Conner's efforts to detain her and orders to "stop." Jones Body Cam 02:30–02:37; Conner Body Cam 02:55–03:09.

In an effort to prevent further escalation, Conner advised Ross that she would be tased if she continued to resist. At that point, Jones was able to place Ross' hands behind her back, but Jones and Conner had difficulty placing Ross in handcuffs because she continued to squirm and fight. Another officer who had just arrived helped place Ross in handcuffs. Conner Decl. ¶¶ 23–24; Conner Body Cam 03:06–03:46. Conner patted down Ross' person for weapons before placing Ross in the backseat of Jones' vehicle. Conner Decl. ¶ 25; Conner Body Cam 03:47–04:39; Jones Body Cam 04:00–04:06; Compl. at 4. Finally, Ross was detained so that the officers could investigate the nature of the domestic dispute and locate Townes' missing firearm. Conner Decl. ¶ 26.

5

Conner then questioned Townes. Townes reported that she and Ross had ended their relationship, that Ross "busted up" the walls in Townes' apartment, that Townes' firearm was missing, and that when Townes asked Ross to return her firearm, Ross stated, "Find it," and "Call the police." Conner Decl. ¶ 27; Conner Body Cam 04:51–05:09. Conner accompanied Townes into the apartment to view the wall damage and to continue to gather information on the domestic dispute and Townes' missing firearm. Townes stated that the firearm was under her mattress that morning, that Ross was the only other individual in the apartment, and that Townes noticed that the firearm was missing about five minutes before placing the 911 call. Conner Decl. ¶¶ 28–29; Conner Body Cam 05:51–06:03, 06:10–06:48.

At approximately 3:47 p.m., an officer opened the back door of Jones' vehicle and advised Ross of her *Miranda* rights. When the officer asked if Ross wanted to speak with him, Ross said, "Nope. I want you to take me to jail or get me the fuck up out this car." Ross then began yelling profanities at the officer, and the officer closed the door. Jones Decl. Ex. 2-2 ("Vehicle Cam") at 07:02–07:52. At about 3:53 p.m., a call for assistance went out to the radios of the officers in the apartment as Ross had begun kicking the window in the backdoor of Jones' vehicle. *See* Compl. at 4; Conner Decl. ¶ 30. Before doing so, Ross said, "Now I'm bout to get reckless." Conner and the other officers ran to Jones' vehicle, where two officers were attempting to restrain Ross in the backseat. Ross was yelling at the officers to take her to jail instead of having her sit in the backseat. Vehicle Cam 11:51–12:43; Conner Body Cam 12:16–12:19; Conner Decl. ¶ 30. An officer advised Ross that she was being arrested for obstruction. Ross continued to yell profanities and refused to get fully into the backseat. As a result, Jones placed leg restraints on Ross' ankles. Conner Decl. ¶¶ 31–32; Jones Body Cam 12:10–14:05; Vehicle Cam 12:36–12:50. When the officers advised Ross that she was under arrest and that

they would take her to jail, Ross placed her feet back in the vehicle but threatened that if the officers did not take her to jail, the window in the backdoor of Jones' vehicle was "going out." Conner Decl. ¶ 33; Vehicle Cam 14:36–14:42.

Around 3:56 p.m., Jones began transporting Ross to the Albemarle-Charlottesville Regional Jail ("Jail"). Before leaving the parking lot of the apartment complex, Jones removed Ross' cell phone from the roof of his vehicle and placed it in vehicle's cup holder. Vehicle Cam 14:34–14:48; Jones Body Cam 14:40–14:45, 15:19–15:36; Jones Decl. ¶¶ 29–30. After Jones left with Ross, Conner returned to Townes' apartment to take pictures of the wall damage and to gather additional information regarding the missing firearm. Conner Decl. ¶ 34.

Jones arrived at the Jail at approximately 4:13 p.m. and opened the backdoor of the vehicle for Ross to exit. When Ross exited the vehicle, she told Jones to get her cell phone, and Jones responded that he would. When Jones tried to take Ross' arm to direct her to the receiving officers, Ross jerked away from him and said, "Who the fuck you think you're talking to? Get the fuck up off me." Jones directed Ross to two other law enforcement officers, who escorted Ross away from the vehicle. [1] Vehicle Cam 33:05–33:17; Jones Decl. ¶¶ 30–31.

Shortly thereafter, Conner and Ross went before the magistrate judge at the Jail and Conner swore out two criminal complaints against Ross, including one for obstruction of justice with threat or force in violation of Virginia Code § 18.2-460(B). Conner Decl. ¶ 35. The magistrate judge issued an arrest warrant based on Conner's testimony. Conner Decl. Ex. 1-3. Conner later learned that Townes had found her firearm on top of the kitchen cabinets in her apartment where it had been placed out of her reach.

On October 16, 2023, after reviewing her body-camera footage and learning from

---

[1] Ross' allegation that Officer Jones "aggressively pushed" her toward to jail is not supported by the Vehicle Cam footage.

7

Townes that she had found her firearm, Conner swore out a criminal complaint for violations of Virginia Code § 18.2-57(C) (assault and battery on a police officer—two counts), § 18.2-415 (disorderly conduct) and § 18.2-308.2(A) (possession or transportation of firearms by a convicted felon). Conner Decl. ¶ 38. A magistrate judge issued arrest warrants based on the criminal complaints. Conner Decl. ¶ 38; Conner Decl. Ex. 1-4. At the time of briefing, four charges arising from Ross' October 12, 2023 arrest were pending in the General District Court of Albemarle County. *Commonwealth v. Ross*, Nos. GC23010091-00, GC23010191-00, GC23010192-00, GC23010193-00 (Albemarle Cnty. Gen. Dist. Ct.). Since then, the possession of a firearm charge was dismissed and others were certified to the Circuit Court where the charges are scheduled to be heard on April 1, 2025.

### III. Discussion

Law enforcement officers are permitted to conduct brief investigatory stops, known as *Terry* stops, that fall short of an arrest. *Terry v. Ohio,* 392 U.S.1, 30 (1968). *Terry* stops do not violate the Fourth Amendment if officers have a reasonable, articulable suspicion that criminal activity may be afoot. *U.S. v. Mitchell,* 963 F.3d 385, 390 (4th Cir. 2020) (quoting *Terry,* 392 U.S. at 30). Officers conducting a *Terry* stop are permitted to take steps reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop. *U.S. v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995).

Here, the officers were responding to a domestic dispute between Plaintiff and Townes, and they understood that Plaintiff may have taken Townes' firearm. The officers were justified in attempting to perform a *Terry* stop to investigate. Plaintiff's refusal to comply with the officers' lawful *Terry* stop escalated the situation and led the officers to arrest her for obstruction of justice. Although Plaintiff claims that she was subjected to excessive force and unlawful seizure

during the *Terry* stop, the evidence does not support such a finding.

    A.    **Excessive Force**

Courts analyze excessive force claims under an "objective reasonableness standard" and examine the officer's actions in light of the facts and circumstances confronting her, without regard to her underlying intent or motivation. *Bellotte v. Edwards*, 629 F.3d 415, 424 (4th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 389 (1989)); *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018) (quoting *Graham*, 490 U.S. at 397). We evaluate three factors in analyzing excessive force claims: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether she is actively resisting arrest or attempting to evade arrest by flight. *Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018) (citing *Graham*, 490 U.S. at 397). An analysis of these factors given the clear evidence presented in body camera and vehicle footage leads the Court to conclude that Plaintiff was not a victim of excessive force.

Plaintiff undoubtedly posed an immediate threat to the safety of the officers. She continued to evade Conner in a combative and aggressive manner as Conner attempted to detain her. *See* Conner Decl. ¶11; Conner Body Cam 00:44–00:48. She continually threatened Conner, stating repeatedly: "Touch me and I'm going to light yo ass up" and "I'm going to fight you." Conner Decl. ¶ 15; Conner Body Cam 00:57–01:08, 02:45–02:54; Jones body Cam 02:10–02:14. In attempting to evade arrest, Plaintiff began swinging her arms, hitting Officer Jones. Jones Body Cam 02:15–02:30; Jones Decl. ¶ 15; Conner Decl. ¶ 22. Plaintiff's threats and her aggressive behavior posed an immediate threat to the officers' safety.

Plaintiff was also clearly resisting arrest and attempting to flee the scene, as she continued backing away from the officers and loading her belongings into her awaiting "ride."

9

Conner Body Cam 01:40–02:03. Plaintiff even told Conner she planned to leave. Conner Decl. ¶¶ 17–19; Conner Body Cam 01:59–02:56. As Jones approached Plaintiff, she spun as if preparing to run. Jones Body Cam 02:15–02:30; Jones Decl. ¶ 15; Conner Decl. ¶ 22. Plaintiff continued to resist Jones' and Conner's efforts to detain her and orders to "stop." Jones Body Cam 02:30–02:37; Conner Body Cam 02:55–03:09. Only when Conner told Plaintiff that she would be tased if she continued to resist was Jones able to place Plaintiff's hands behind her back. A third officer was required to successfully handcuff and detain her. Conner Decl. ¶¶ 23–24; Conner Body Cam 03:06–03:46.

Plaintiff's allegations that "officers [were] rushing toward [her] and grabbing for [her]" and that Officer Jones "aggressively pushed [her] toward the jail door" are refuted by the video evidence before the Court. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Thus, when the record contains video footage that is not open to more than one interpretation and contradicts the non-movant's assertions, the Court 'view[s] the facts in the light depicted by the videotape.'" *Hall v. Washington Metro. Area Transit Auth.*, 33 F. Supp. 3d 630, 632 (D. Md. 2014) (quoting *Scott*, 550 U.S. at 381)); *Witt*, 633 F.3d at 276.

Here, the record contains video footage that is not open to more than one interpretation and contradicts Plaintiff's assertions. Accordingly, the Court views the facts in the light depicted by the videotape. *Hall,* 33 F. Supp. 3d at 632 (quoting *Scott*, 550 U.S. at 381); *Witt*, 633 F.3d at 276. The clear evidence presented on body camera footage, filtered through the "perspective of a reasonable officer on the scene," *Graham*, 490 U.S. at 396, confirms that Plaintiff posed a danger

10

to the officers, was actively and fervently resisting arrest, and was attempting to flee the scene such that the officers' use of force was not excessive. Plaintiff's allegations are blatantly contradicted by the record such that no reasonable jury could believe them. *Scott*, 550 U.S. 372 at 380. Plaintiff was not subjected to excessive force; therefore, Defendants are entitled to summary judgment on Plaintiff's excessive force claim.

### B. Unlawful Seizure/False Arrest

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable seizures." U.S. Const. amend. IV. To establish an unreasonable seizure under the Fourth Amendment, Plaintiff must demonstrate that she was arrested without probable cause which is determined from the totality of the circumstances known to the officer at the time of the arrest. *See Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) (citing *Dunaway v. New York*, 442 U.S. 200, 213 (1979)); *Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003). As a matter of law, none of Plaintiff's claims can proceed if the officers had reasonable suspicion to detain and probable cause to arrest Plaintiff.

Here, the evidence is clear that the officers had probable cause to arrest Plaintiff for obstruction of justice under Va. Code Ann. § 18.2-460(B), which provides ". . . any person who, by threats or force, knowingly attempts to intimidate or impede a . . . law-enforcement officer . . . is guilty of a Class 1 misdemeanor." Va. Code Ann. § 18.2-460(B). "Obstruction ordinarily implies opposition or resistance by direct action." *Cromartie v. Billings*, 298 Va. 284 (2020).

Police were conducting a lawful *Terry* stop necessitating the detention of Plaintiff. Plaintiff was agitated and volatile from the beginning of her interaction with the officers. She refused to answer the officers' questions, repeatedly made verbal and physical threats toward them, and persistently failed to comply with their instructions. Conner Body Cam 00:30—01:08,

02:45–02:54; Jones Body Cam 02:10–02:14. Plaintiff was actively attempting to leave the scene. Conner Body Cam 01:40–02:03, 02:45–02:54; Jones Body Cam 02:10–02:14. The video evidence is clear that Plaintiff had no intention of complying with the officers' directions and was actively preventing them from investigating the disturbance. Plaintiff was clearly obstructing justice. *See Figg v. Schroeder*, 312 F.3d 625 (4th Cir. 2002) (holding that officer had probable cause to detain person for obstruction where she arrived on the scene agitated and physically encroached upon nascent police investigation). Accordingly, Plaintiff was not unlawfully seized, and summary judgment is granted on Plaintiff's unlawful seizure claim.

### C. Malicious Prosecution

"A malicious prosecution claim under Section 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (citing *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)). To prevail on such a claim, a plaintiff must show that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor. *Id.* (citing *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012)).

Plaintiff's charges on assault, disorderly conduct and possession of firearm by a felon were supported by probable cause, and they have not been tried in state court. Therefore, she cannot demonstrate that the criminal proceedings terminated in her favor. Accordingly, her claim for malicious prosecution fails, and the officers are entitled to summary judgment on this claim.

\*\*\*

Defendants' Motion for Summary Judgment (Dkt. 9) is GRANTED. The Clerk of the Court is directed to send a copy of this Memorandum Opinion and Order to the parties and

counsel of record and to strike this case from the active docket.

Entered this 25th day of March, 2025.

                                               NORMAN K. MOON
                                               SENIOR UNITED STATES DISTRICT JUDGE